STATE OF CONNECTICUT *v.* JAMES J. FARR
(AC 26050)

Bishop, Harper and McDonald, Js.

Argued April 25—officially released October 17, 2006

*Mary H. Trainer*, special public defender, for the appellant (defendant).

*Bruce R. Lockwood*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *David L. Zaguja*, assistant state's attorney, for the appellee (state).

*Opinion*

MCDONALD, J. The defendant, James J. Farr, appeals from the judgment of conviction, rendered after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4) and interfering with an officer in violation of General Statutes § 53a-167a. The defendant claims that (1) he was subjected to an illegal search and seizure and that any resulting evidence should have been suppressed, (2) there was insufficient evidence to support his conviction of robbery in the first degree and (3) the prosecutor engaged in misconduct that deprived

him of a fair trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On March 1, 2003, the victim, Kim Campbell, a registered nurse, arrived at Riverside Health Care Center at 745 Main Street in East Hartford at approximately 6:50 p.m. for her nursing assignment. As the victim parked and exited her car, a man jumped out at her over a snowbank, stuck what appeared to be a gun in her face and demanded her purse. When the victim stated that she did not have a purse, the man demanded her money. The victim took her wallet from under the driver's seat of her car and handed it to the man, who then fled with the wallet. The victim's wallet contained her motor vehicle operator's license, one or two credit cards, telephone cards and a handful of silver coins.

After the man fled, the victim called 911 with her cellular telephone and reported the incident. Kwanza Clayton, an officer with the East Hartford police department, arrived within five minutes, and the victim told him that a white man, about five feet, ten inches in height, wearing dark clothing and a mask had robbed her and fled, running in a northbound direction. Clayton then broadcast the information to fellow officers over the police radio. Robert Pronovost, a sergeant with the East Hartford police department, responded within one minute, reporting that he had seen a white male matching the description about 5000 feet, less than one mile, from Riverside Health Care Center, running in an open field in an easterly direction toward the Walgreens store on Main Street in East Hartford.

Pronovost stopped the man, who later was identified as the defendant, in the parking lot of the Walgreens and performed a *Terry* search for weapons. See *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Pronovost saw that the defendant was wearing

a white sweatshirt and, during the search, noticed that he had dark gloves in his back pocket. Pronovost perceived that although the weather that night was very cold and clear, the defendant's heart was racing and he was perspiring profusely. In the front pocket of the defendant's sweatshirt, Pronovost found a purple telephone card and $4.55 in silver coins. The defendant was detained and placed in custody.

The police took the defendant back to the victim at Riverside Health Care Center. The victim was able to recognize the defendant's eyes and noticed that he had the same size and build as the man who had taken her wallet, but was not able positively to identify the defendant as the perpetrator. The defendant identified himself as "David LaForest" and provided a birth date of December 5, 1964. The police later discovered that the defendant was James Farr with a birth date of September 24, 1964. At trial, the victim described the perpetrator as a white male who was wearing a dark ski mask and gloves and dressed in dark clothing with something like "a white lining" or "the collar of his coat" or "white clothing underneath" that was revealed around his neck area. The victim could see that he was a white man by the color of the skin underneath his eyes, which was exposed by the eyeholes cut out of the ski mask.

At the scene, when questioned about where he had been, the defendant answered that he had been to visit his mother at 886 Main Street and his friend, Donald Tilson, at 44 Connecticut Boulevard in East Hartford. An officer then went to 886 Main Street and knocked on the door but received no answer. When confronted with this information, the defendant stated that he had gone to the address, rang the doorbell and there had been no answer. Shortly thereafter, Pronovost received a call from another officer that something of interest had been found in a garbage can next to a rooming house at 42-44 Connecticut Boulevard, which was about

fifty to seventy-five yards from where Pronovost first saw the defendant. Under the lid at the top of the garbage can was a black jacket and a black sweatshirt, and about seven feet away on the ground was a black ski mask. No firearm was ever recovered.[1] The recovered items were taken to the scene where the victim identified them as having been worn by the perpetrator. She also recognized the purple telephone card as belonging to her. As to the silver coins found on the defendant, the victim did not know the exact amount of the coins that she had had in her wallet but did know that it had been a handful of silver coins.

On April 22, 2003, Clayton executed a search warrant for DNA samples from the defendant. The black ski mask was submitted for DNA testing, and a swabbing from the inside of the ski mask demonstrated that the defendant was included as a contributor to the DNA profile from the mask. A swabbing from the outside of the ski mask demonstrated that the defendant could not be eliminated as a contributor to the DNA material on the mask.

In a letter dated September 22, 2003, and addressed to Judge Solomon, who had appointed the defendant's public defender, the defendant offered his version of the events that took place on March 1, 2003. At trial, the letter was offered into evidence by the state and read to the jury. In the letter, the defendant denied having committed the robbery. He said that drizzling rain had been falling as he jogged toward Walgreens. He admitted that the clothes recovered by the police were his, but he claimed that he had given them to a homeless friend named Kevin Luzey. He also claimed in the letter that the purple telephone card and silver

---

[1] The wallet was recovered on March 21, 2003, several weeks after the robbery, when a business at 42 Connecticut Boulevard found it and turned it over to the police. The wallet contained a motor vehicle operator's license and a credit card, both of which bore the victim's name.

coins that the police had found on him had been given to him by Luzey.

After the trial, the jury returned a verdict of guilty. The defendant was sentenced to a total effective term of seven years incarceration followed by five years of special parole. This appeal followed. Additional facts will be set forth as needed.

I

The defendant claims that he was subjected to an illegal search and seizure and that any resulting evidence should have been suppressed. On appeal, he argues that the police lacked a reasonable and articulable suspicion to detain him and that they subjected him to an improper *Terry* search.[2] He therefore maintains that the telephone card, coins and gloves seized as a result of the illegal search should have been suppressed as "fruits of the poisonous tree."[3] We decline to review this claim because the defendant has not satisfied the first prong of *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

The defendant concedes that his claim was not preserved properly and argues that he is entitled to review under *Golding.* In *Golding,* our Supreme Court set forth the conditions under which a defendant can prevail on an unpreserved constitutional claim. Id. A defendant can prevail only if all of the following conditions are met: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3)

---

[2] "When conducting a patdown search of a suspect, the officer is limited to an investigatory search for weapons in order to ensure his or her own safety and the safety of others nearby." (Internal quotation marks omitted.) *State* v. *Starks,* 94 Conn. App. 325, 330, 892 A.2d 959, cert. denied, 278 Conn. 918, 901 A.2d 44 (2006); see also *Terry* v. *Ohio,* supra, 392 U.S. 29.

[3] "Under the exclusionary rule, evidence must be suppressed if it is found to be the fruit of prior police illegality." (Internal quotation marks omitted.) *In re Nicholas R.,* 92 Conn. App. 316, 321 n.4, 884 A.2d 1059 (2005).

the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." Id. "The first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the defendant may prevail." *State* v. *George B.*, 258 Conn. 779, 784, 785 A.2d 573 (2001).

In *Golding*, our Supreme Court stated that "[t]he defendant bears the responsibility for providing a record that is adequate for review of his claim of constitutional error. If the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim." *State* v. *Golding*, supra, 213 Conn. 240.

The defendant did not file a motion to suppress, no suppression hearing was held and the court had no opportunity to make any factual or legal findings as to this issue. The defendant, however, relying on *State* v. *Torres*, 230 Conn. 372, 379–80, 645 A.2d 529 (1994), argues that the record at hand is adequate for *Golding* purposes, even if the court never found any facts or reached a conclusion of law, because the record contains the factual predicates for making such a determination. "Under the *Golding* doctrine, a conclusion of law can properly be made by an appellate court, even if the trial court was never asked to make, and never made, such a determination, so long as the factual record is adequate to provide the basis for such a conclusion." Id., 379. The question of whether a reasonable and articulable suspicion arises from an underlying set of facts is a legal conclusion. Id. "Accordingly, if there is in the appellate record a sufficient underlying set of

facts upon which an appellate court can answer the question of whether a reasonable and articulable suspicion existed, the first prong of *Golding* is satisfied." Id., 379–80. In this case, therefore, the question is the existence of such a record. Here, the defendant directs us to the testimony of Clayton and Pronovost as providing the set of facts that will allow us to make our determination.

The defendant argues that the record is sufficient to reveal that the police lacked a reasonable and articulable suspicion at the time he was stopped. We set forth the applicable legal principles. "Under the fourth amendment to the United States Constitution and article first, §§ 7 and 9, of our state constitution, a police officer is permitted in appropriate circumstances and in an appropriate manner to detain an individual for investigative purposes if the officer believes, based on a reasonable and articulable suspicion that the individual is engaged in criminal activity, even if there is no probable cause to make an arrest." (Internal quotation marks omitted.) *State* v. *Straub*, 90 Conn. App. 147, 150–51, 877 A.2d 866, cert. denied, 275 Conn. 927, 883 A.2d 1252 (2005). "Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . . In ascertaining whether reasonable suspicion existed for the patdown search, the totality of the circumstances—the whole picture—must be taken into account." (Internal quotation marks omitted.) *State* v. *Starks*, 94 Conn. App. 325, 330–31, 892 A.2d 959, cert. denied, 278 Conn. 918, 901 A.2d 44 (2006). "The trial court must consider whether, in light of the totality of the circumstances, the police had a particularized and objective basis for suspecting that person of criminal activity. . . . The trial court's conclusions must stand

unless they are legally and logically inconsistent with the facts found." (Citation omitted.) *State* v. *Pettway*, 39 Conn. App. 63, 71, 664 A.2d 1125, cert. denied, 235 Conn. 921, 665 A.2d 908 (1995).

An examination of the record leads us to conclude that it is inadequate for review. We do not know if all of the facts surrounding Pronovost's detention of the defendant were brought to light during the trial. We do not know how many other people were in the vicinity of the crime scene or what other people were nearby when the defendant was first observed. See *State* v. *Daniels*, 248 Conn. 64, 80–81, 726 A.2d 520 (1999). Neither party questioned Pronovost specifically as to the totality of the circumstances under which he first observed the defendant. As our Supreme Court observed in *State* v. *Tatum*, 219 Conn. 721, 727 n.11, 595 A.2d 322 (1991), we have "no way of divining what evidence the state might have presented to rebut the defendant's claim . . . ." We thus conclude that the factual background necessary for disposition of this claim is deficient.

The defendant also argues that the police subjected him to an improper *Terry* search. Specifically, he contends that Pronovost's search of the defendant in the Walgreens parking lot exceeded the limits of the plain feel doctrine.

"In *Minnesota* v. *Dickerson* [508 U.S. 366, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993)], the United States Supreme Court established the plain feel exception to the warrant requirement, as a matter of federal constitutional law. Under *Dickerson*, a police officer acting without a warrant may seize contraband that the officer detected through the sense of touch during a lawful patdown search. . . . Specifically, the United States Supreme Court held that, [i]f a police officer lawfully pats down a suspect's outer clothing and feels an object

whose contour or mass makes its identity *immediately apparent*, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context." (Emphasis in original; internal quotation marks omitted.) *State* v. *Gregory*, 74 Conn. App. 248, 262–63, 812 A.2d 102 (2002), cert. denied, 262 Conn. 948, 817 A.2d 108 (2003).

Our review of the record discloses that the facts concerning the patdown are not sufficiently developed to consider this issue. Pronovost's testimony reveals only that he performed a patdown and found gloves in the defendant's back pocket, and a telephone card and $4.55 in change in the defendant's front sweatshirt pocket. There is nothing to indicate, as the defendant now asserts, that Pronovost continued to search the defendant even after determining that there were no weapons or that he did not feel suspicious items on the defendant during the patdown.

In light of the foregoing, we conclude that this claim was not developed sufficiently in the trial court for this court to review the circumstances surrounding the search and seizure of the defendant and whether any resulting evidence should have been suppressed. Consequently, the defendant's claim fails to satisfy the first prong of the *Golding* analysis, and we therefore decline to afford it review.

II

The defendant next claims that there was insufficient evidence to support his conviction of robbery in the first degree. In support of his claim, the defendant argues that the victim's testimony never positively identified him as the person who robbed her and that the clothing, telephone card and coins recovered near the

scene of the crime could not reliably be connected to him. He therefore contends that "[a] reasonable jury could not have concluded that the victim identified the defendant beyond a reasonable doubt." We are not persuaded.

"In reviewing a sufficiency [of the evidence] claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . . In conducting our review, we are mindful that the finding of facts, the gauging of witness credibility and the choosing among competing inferences are functions within the exclusive province of the jury, and, therefore, we must afford those determinations great deference." (Citation omitted; internal quotation marks omitted.) *State* v. *James P.*, 96 Conn. App. 93, 97–98, 899 A.2d 649 (2006).

On the basis of our review of the record, we conclude that even though the victim was not able positively to identify the defendant, there was sufficient circumstantial evidence to support the jury's finding that he was the person who robbed the victim. "Where . . . the identification of the defendant is derived from circumstantial evidence, it is, nonetheless, the cumulative impact of a multitude of factors that must be examined to determine whether the identification of the defendant has been satisfactorily established by circumstantial evidence. . . . In criminal cases, including the most serious ones, the fact that an accused was the person

who committed the criminal act may be proved by circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Barlow*, 70 Conn. App. 232, 238, 797 A.2d 605, cert. denied, 261 Conn. 929, 806 A.2d 1067 (2002).

Minutes after the victim was robbed, the defendant was found by the police less than one mile from the scene of the crime, running and perspiring profusely. The weather was cold, and he did not wear outer clothing. At trial, the victim described the perpetrator as wearing dark clothing with something white underneath, a dark ski mask and gloves. When the defendant was detained, he was wearing a white sweatshirt and carried dark gloves in his pocket. A black jacket, black sweatshirt and black ski mask were found near a house that the defendant admitted to having visited that evening. When the defendant was brought to the victim for identification, she was able to recognize his eyes and noticed that he had the same size and build as the man who had taken her wallet. She also recognized the black clothing and black ski mask found by the police as having been the items of clothing worn by the perpetrator. Additionally, the victim recognized as belonging to her the purple telephone card found on the defendant. Although she did not know the exact amount of the change that she had had in her wallet, she did know that she had been carrying a handful of silver change. The defendant was found with $4.55 in silver change in the front pocket of his sweatshirt. The inside of the ski mask contained a DNA profile that included the defendant as a contributor, and the defendant could not be excluded as a contributor to the DNA material on the outside of the mask. In the defendant's letter to Judge Solomon, he stated that he had given his jacket and other clothing to Kevin Luzey that night and later received the victim's telephone card and some change from Luzey.

Reviewing the evidence in the light most favorable to sustaining the verdict, we conclude that sufficient evidence existed to convict the defendant of robbery in the first degree in violation of § 53a-134 (a) (4). The defendant's claim, therefore, fails.

### III

The defendant asserts that the prosecutor engaged in misconduct during closing and rebuttal arguments that deprived him of a fair trial. Specifically, the defendant argues that the prosecutor's comments inappropriately appealed to the jury's emotions and improperly alluded to facts not in evidence. On the basis of our review of the record, we do not agree that misconduct occurred.

The defendant failed to object to the alleged instances of misconduct at trial, and, thus, his claims are unpreserved.[4] We will, however, review his claims following the analytic approach set forth by our Supreme Court in *State* v. *Stevenson*, 269 Conn. 563, 572–73, 849 A.2d 626 (2004). In *Stevenson*, the court held that "following a determination that prosecutorial misconduct has occurred, regardless of whether it was objected to, an appellate court must apply the . . . factors [set forth in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)] to the entire trial." *State* v. *Stevenson*, supra, 575. Before we review the challenged remarks, we set forth our standard of review.

"Prosecutorial misconduct claims invoke a two step analysis. First, the reviewing court must determine whether the challenged conduct did, in fact, constitute misconduct. Second, if misconduct occurred, the reviewing court must then determine if the defendant has demonstrated substantial prejudice. . . . In order

---

[4] The defendant asserts that he preserved his claims by objecting at trial, but the portion of the trial transcript he identifies relates to comments made by the prosecutor that are not the subject of this appeal.

to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the misconduct so infected the trial with unfairness as to make the conviction a denial of due process." (Citation omitted; internal quotation marks omitted.) *State v. Pedro S.*, 87 Conn. App. 183, 187, 865 A.2d 1177, cert. denied, 273 Conn. 924, 871 A.2d 1033 (2005).

Because the claimed prosecutorial misconduct occurred during closing arguments, we advance the following legal principles. "[P]rosecutorial misconduct of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such misconduct has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State v. Boyd*, 89 Conn. App. 1, 29–30, 872 A.2d 477, cert. denied, 275 Conn. 921, 883 A.2d 1247 (2005).

## A

The defendant argues that the prosecutor's comments during closing and rebutttal arguments inappropriately appealed to the jury's emotions.

In closing argument, the prosecutor commented to the jury: "Does it make sense that someone like this defendant, and I'm not asking you to speculate that he's like anything or not like anything, but he did retrieve clothing, gave it to Kevin Luzey, stayed with just a sweatshirt on; in fact, gave him a nylon jacket, but he finds it important to explain in the letter . . . that it

was drizzling out. The drizzle, which actually contradicts the stipulation [entered into by the parties] relative to the weather conditions, is an explanation for his shirt being wet, rather than [his having been] sweating profusely because he just ran after committing a robbery, and he was sweating and his heart was beating. . . . I ask you to consider what type of a person he is or how generous he is in that he would leave himself with just a sweatshirt, give this clothing to a person named Kevin Luzey and be exposed to the elements, the rain?" Later, in rebuttal argument, the prosecutor commented: "I'm not going to go through it, but what strikes me is the similarities between an episode of [the television program] *M\*A\*S\*H* I saw where I think Hawkeye and Trapper set Frank Burns up, and they set him up with some false information and he bit and that's just it; he bit."

The defendant argues that by these comments, the prosecutor characterized the defendant as "a mean-spirited, selfish, inconsiderate person" in the first instance and "a fool and a buffoon who is not caring, generous or kind" in the second instance.

"It is well settled that [a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal. . . . Therefore, a prosecutor may argue the state's case forcefully, [but] such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special

position. . . . Nevertheless, [w]hen making closing arguments to the jury . . . [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Citation omitted; internal quotation marks omitted.) *State* v. *Little*, 88 Conn. App. 708, 717–18, 870 A.2d 1170, cert. denied, 274 Conn. 916, 879 A.2d 895 (2005).

The prosecutor's first comment did not characterize the defendant as "a mean-spirited, selfish, inconsiderate person," as the defendant contends. The prosecutor set forth the evidence and asked the jury to weigh that evidence and to use common sense to determine the likelihood of the defendant's version of events. "Remarks that are nothing more than a permissible appeal to the jurors' common sense do not constitute prosecutorial misconduct." *State* v. *Lindo*, 75 Conn. App. 408, 416, 816 A.2d 641, cert. denied, 263 Conn. 917, 821 A.2d 771 (2003). There is also no rule that precludes a prosecutor from challenging the defendant's account. See *State* v. *Pedro S.*, 87 Conn. App. 183, 199, 865 A.2d 1177, cert. denied, 273 Conn. 924, 871 A.2d 1033 (2005).

As to the prosecutor's comment during rebuttal argument noting similarities to an episode of a television show, it did not represent the defendant as "a fool and a buffoon who is not caring, generous or kind." It was a rhetorical device that was clarified when the prosecutor quickly made it clear that he was discussing the letter written by the defendant. The prosecutor went on to point out inconsistencies between some of the evidence and what was represented in the letter. "[T]he occasional use of rhetorical devices is simply fair argument." (Internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 464, 832 A.2d 626 (2003) (noting that rhetorical device of incorporating literary theme into closing argument not improper). It also is "not improper

for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . ." (Internal quotation marks omitted.) *State* v. *Martinez*, 95 Conn. App. 162, 184, 896 A.2d 109, cert. denied, 279 Conn. 902, 279 A.2d 902 (2006).

## B

The defendant next argues that several of the prosecutor's comments during closing and rebutttal arguments constituted improper comment on facts not in evidence. We examine the alleged instances of misconduct in the context in which they were presented.

In closing argument, the prosecutor made the following statements:[5] "[The victim] indicated that someone came up to her as she exited her car. . . . She turned over her wallet . . . to that person. . . . [*The victim*] *was able to identify that person by his clothing.* . . . Within the garbage can [was] found . . . a black jacket. . . . *This black jacket [was] identified by [the victim] as being the jacket worn by the person who demanded money of her.* . . . Put all those things together. Put the location where he was detained from where the robbery occurred; the time frame; *the items he had on him, positively identified by the victim . . . as being taken from her wallet* . . . . Is that enough to convict him beyond a reasonable doubt? Is there any reasonable doubt as to his innocence? As to his guilt? There isn't. But the defendant, unfortunately, takes another step. . . . He wrote a letter . . . . [I]n writing the letter [the defendant] understands the evidence, or at least has a belief as to what's being offered against him. He has read the police reports. He references the police reports. He makes specific mention in the letter about the police reports . . . . *He has full knowledge, or at*

---

[5] The alleged improper statements are italicized.

*least apparent knowledge, as to what witnesses are saying and what people will say if they're brought into court. . . . He ran like the dickens.* He was in that area of [44] Connecticut Boulevard. *He stripped the clothing off, the clothing that could identify him, threw it in that area, quickly took what he thought could be of value, left the credit card in the wallet, threw it, and it was recovered at that location by the police.* That's what happened." (Emphasis added.)

It is well established "that a prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument. . . . A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence. . . . Moreover, when a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury." (Internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 746, 888 A.2d 985 (2006).

Our careful review of the record reveals that the prosecutor's remarks were nothing more than fair comment on the evidence and did not constitute misconduct. "[I]t is not improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . ." (Internal quotation marks omitted.) *State* v. *Martinez*, supra, 95 Conn. App. 184.

The judgment is affirmed.

In this opinion the other judges concurred.